**FILED**

**March 30, 2016**

TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD

**Time: 10:25 AM**



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Stephen W. Shepherd | ) Docket No. 2015-01-0325 |
| | ) |
| v. | ) State File No. 79562-2015 |
| | ) |
| Haren Construction Company, Inc., et al. | ) |
| | ) |
| | ) |
| Appeal from the Court of Workers' | ) |
| Compensation Claims | ) |
| Thomas Wyatt, Judge | ) |

---

### Affirmed as Modified and Remanded - Filed March 30, 2016

---

This interlocutory appeal involves an employee who was injured while in the course and scope of his employment and was subsequently terminated by the employer. The employee requested payment of temporary disability benefits, which the employer denied on the basis it terminated the employee for cause and would have provided light duty work but for the termination. Following an expedited hearing, the trial court denied the employee's request for temporary disability benefits, finding the employee was terminated for cause. The employee has appealed. Having carefully reviewed the record, we affirm the trial court's decision denying temporary disability benefits, modify the decision concerning the payment of medical benefits based on the parties' stipulation, and remand the case for further proceedings as may be necessary.

Judge David F. Hensley delivered the opinion of the Appeals Board, in which Judge Marshall L. Davidson, III, and Judge Timothy W. Conner joined.

William J. Brown, Cleveland, Tennessee, for the employee-appellant, Stephen W. Shepherd

1

Leslie Bishop, Knoxville, Tennessee, for the employer-appellee, Haren Construction Company, Inc.

**Factual and Procedural Background**

Stephen Shepherd ("Employee"), a resident of Polk County, Tennessee, was employed as a heavy equipment operator by Haren Construction Company, Inc. ("Employer"), on July 14, 2015, when he suffered a laceration injury to his left forearm that arose primarily out of and in the course and scope of his employment. Employer accepted the injury as compensable. Although there is some discrepancy regarding the exact circumstances of the incident causing the injury, the occurrence of the injury is undisputed. Employee was provided medical care at a walk-in urgent care clinic in Clay, North Carolina, where Employee was working with a five-person crew installing pipeline. Employee's laceration was sutured and he was released to work with instructions to keep the wound clean and dry for two days. He returned to work on the afternoon of his injury.

Employee worked the following day, July 15, 2015. On July 16, 2015, Employee was operating a backhoe and accidently ruptured a gas line while digging a trench in which pipe was to be laid. The incident resulted in a work stoppage until the gas line could be repaired, and the crew resumed work after repairs were completed. The following day was a travel day for the crew and after a short period of time at the worksite the crew left to return to Tennessee. On July 18, 2015, Employee's supervisor called him and advised that he had been terminated for "running the equipment erratically and then hitting a gas line."

The following work day, Employee went to Employer's office and spoke with Employer's president, Evan Haren. There is a conflict in the parties' testimony concerning whether the conversation between Employee and Mr. Haren included a discussion about Employee's injury, but Employee's purpose in meeting with Employer was to address the reason for his termination. Mr. Haren testified that, before he met with Employee, he was aware that a gas line had been ruptured by an operator and that the rupture had shut down work for a brief period. He testified he did not know who the operator was and did not know that the operator had been terminated until the meeting with Employee. He testified he told Employee "[he] would look into it and if [he] found anything different [from what had been reported to him] about the incident [he] would get back with [Employee] and let him know what [he] found." Mr. Haren further testified there was no mention of Employee's injury or medical care during the meeting, and that the discussion was limited to Employee's termination.

In contrast, Employee testified that he told Mr. Haren about his injury during the meeting and asked, "who is going to deal with this arm?" Employee testified that Mr. Haren said he had not been informed of an on-the-job accident, and that he would "look

2

into that and get back to [him]." Employee denied showing Mr. Haren his arm, stating it was bandaged and "[he] was not going to uncover it." Employee also testified that he told Mr. Haren he "mashed" his shoulder and that he "was having . . . a lot of shoulder pain in my rotator cuff and everything else."

Employer did not provide Employee a panel of physicians for follow-up care for his forearm laceration, and on September 8, 2015, Employee sought treatment on his own with an orthopedic physician, Dr. Patrick Stone. Dr. Stone was subsequently authorized by Employer to provide ongoing reasonable and necessary medical care for Employee's work-related injury. At an expedited hearing, the parties stipulated that all of the medical expenses incurred as a result of treatment with Dr. Stone for Employee's work injury were Employer's responsibility.

The dispute in this case concerns whether Employee is entitled to temporary disability benefits from the date of his termination until the January 28, 2016 expedited hearing.[1] Employer contends Employee is not entitled to temporary disability benefits for the period in question, asserting that Employee was terminated for cause and that it would have accommodated Employee's work restrictions had he not been terminated. Employer relies primarily on the July 16, 2015 gas line rupture as the basis for its termination of Employee, but cited other reasons supporting the termination. In addition to Employee, four individuals testified at the expedited hearing, including Employee's supervisor, Employer's president, Employer's safety manager, and a heavy equipment mechanic for Employer who was present at the worksite when the gas line rupture occurred. The crux of the parties' dispute is whether Employee's rupturing the gas line was the result of his failure to follow his supervisor's instructions and improper operation of the backhoe or was, as characterized by Employee's attorney, an "honest mistake."

Employee testified that on the day of the gas line rupture, he was experiencing numbness in his left hand, thumb, and some of his fingers as a result of his work-related injury two days earlier. He explained that, as a heavy equipment operator, having full sensation in his hands is essential so he can feel the vibration of the machine he is operating and any changes in that vibration that would indicate he had come into contact with something while digging. Because of the laceration on his left arm, Employee testified he had reduced sensation and experienced difficulty in operating the backhoe. He also testified that because he was digging parallel to the gas line, it was less likely that he would feel hesitation if the bucket came into contact with the gas line.

Employee's testimony directly contradicts that of Employer's witnesses regarding whether he was instructed not to dig in the area where the gas line was ruptured. He described working on the backhoe digging parallel to the gas line while his supervisor

---

[1] Dr. Stone took Employee completely off work for a period of time, during which Employer paid temporary total disability benefits. Those benefits are not disputed.

was located nearby on a trackhoe. Employee's recollection of the events immediately prior to rupturing the gas line was that a co-worker, Greg Anthony, served as his "ground man" and watched where Employee was digging to give him instructions or guidance on digging. Employee testified he is "the only person I would have been paying attention to," and "[w]hen he told me to make a move, that was the move that got made." Employee denied having ever heard his supervisor instruct him to stop digging in the area of the gas line. Employee testified that he was hard of hearing as a result of a work history of operating heavy machinery, and that he was wearing earplugs at the time of the incident. He testified that had his supervisor yelled at him to stop digging he would not have been able to hear him. Further, he testified that the gas line was not marked and that the ground where he was digging was undisturbed. He testified that a tooth on the backhoe bucket caught the edge of the gas line "just enough to cut a little gash in it."

When questioned on cross-examination regarding whether he had been disciplined for operating machinery in a dangerous manner, Employee acknowledged having been reprimanded by his supervisor on one occasion when he hit a "silt fence" with an excavator and stated that, if he had ever received other reprimands, they were of such an insignificant nature that they did not "register with [him]." However, he denied having been reprimanded for operating machinery in a "wild" manner and testified he would remember reprimands of that nature.

The testimony of Employee's supervisor was markedly divergent from that of Employee. He testified that the gas line around which Employee was digging had been exposed by workers digging by hand. He testified that when Employee began to use the backhoe near a section of gas line that was still buried, he instructed Employee to stop digging to allow another worker to uncover the line by hand with a shovel so it would be visible. The supervisor stated that Employee heard him tell him to stop digging because Employee responded, "I see the line. I've got this." The supervisor testified that he told Employee that he would rather let a laborer uncover it with a shovel and, when Employee continued to dig, instructed him not to hit the gas line. He stated that Employee took "two more swipes and cut the gas line in two."

The supervisor also testified that, before the day the gas line was ruptured, he had reprimanded Employee four times for operating machinery in an unsafe or "wild" manner. He testified that after Employee continued to dig in the area of the gas line, despite having been told to stop digging, he determined the appropriate course of action was to terminate Employee. Prior to doing so he contacted Employer's safety manager to discuss the possible termination.

Mike Bell, a heavy equipment mechanic for Employer, testified he was present at the worksite and was standing on the curb observing what was going on when the incident occurred. He testified he heard the supervisor instruct Employee not to continue digging where the gas line had not been exposed. He testified the supervisor told

4

Employee to let one of the laborers uncover the gas line with a shovel, and that Employee told the supervisor he could see the gas line and continued digging. He testified that Employee dug beyond where the gas line was exposed and "[a] couple of swipes later, a couple of digs later, he ruptured the gas line."

In addition to testifying about his meeting with Employee following Employee's termination, Employer's president, Mr. Haren, testified about the company's policy of providing light duty work to employees with work restrictions, stating "[w]e almost 100 percent of the time utilize light duty for people who get injuries on jobs." He testified that Employer would have accommodated Employee had he been in need of light duty work with restrictions limiting him to work with no use of one arm. Employee disputed whether light duty work would have been available for him, but offered no evidence in support of his position other than his own testimony.

Lastly, Employer's safety manager, Mike Herrell, testified that he received a telephone call from the supervisor concerning whether to terminate Employee and that he was involved in the decision to terminate Employee. He testified the sole reason for the termination was Employee's insubordination. He also testified Employer has a policy to provide reasonable accommodation to injured employees, stating the work would be "[e]ither in the field or at the office," and that the work "could be through cleaning up around the office, painting, using a paint brush, any number of things."

Following an expedited hearing, the trial court found Employer terminated Employee for cause, observing that Employee's affidavit submitted with his request for expedited hearing was inconsistent with his testimony at the hearing. The trial court found Employer's witnesses to be credible and found the termination was consistent with Employer's policies and, thus, was justified. Accordingly, the trial court denied Employee's request for temporary disability benefits. Employee has appealed.

## Standard of Review

The standard we apply in reviewing a trial court's decision is statutorily mandated and limited in scope. Specifically, "[t]here shall be a presumption that the findings and conclusions of the workers' compensation judge are correct, unless the preponderance of the evidence is otherwise." Tenn. Code Ann. § 50-6-239(c)(7) (2015). The trial court's decision must be upheld unless the rights of a party "have been prejudiced because findings, inferences, conclusions, or decisions of a workers' compensation judge:

(A)  Violate constitutional or statutory provisions;
(B)  Exceed the statutory authority of the workers' compensation judge;
(C)  Do not comply with lawful procedure;
(D)  Are arbitrary, capricious, characterized by abuse of discretion, or clearly an unwarranted exercise of discretion;

5

(E)    Are not supported by evidence that is both substantial and material in the light of the entire record."

Tenn. Code Ann. § 50-6-217(a)(3) (2015).  Like other courts applying the standards embodied in section 50-6-217(a)(3), we will not disturb the decision of the trial court absent the limited circumstances identified in the statute.

## Analysis

As an initial matter, we note that the trial court denied Employee's request for payment of medical expenses incurred with Dr. Stone.  However, the parties stipulated in the expedited hearing that Dr. Stone was the authorized physician, and the Employer agreed that the medical expenses associated with Dr. Stone's treatment of the work injury "would be paid pursuant to the fee schedule."  In its brief on appeal, Employer stated that "the bill for services of Dr. Stone of September 8, 2015, was paid."  Therefore, the trial court's order regarding the denial of payment for the medical expenses arising from the initial treatment with Dr. Stone for Employee's work injury is modified to provide that Employer is responsible for all reasonable and necessary medical expenses incurred with Dr. Stone as a result of the work injury.

With respect to the trial court's denial of temporary disability benefits, Employee raises as an issue in the notice of appeal and in his brief whether the trial court erred in failing to award temporary total disability benefits from the date of Employee's termination.[2]  To receive temporary total disability benefits, an employee must prove (1) total disability from working as the result of a compensable injury; (2) a causal connection between the injury and the inability to work; and (3) the duration of the period of disability.  *Simpson v. Satterfield*, 564 S.W.2d 953, 955 (Tenn. 1978).  Where the disability is not total, an employee may recover temporary partial disability benefits if the employee "is able to resume some gainful employment but has not reached maximum recovery."  *Williams v. Saturn Corp.*, No. M2004-01215-WC-R3-CV, 2005 Tenn. LEXIS 1032, at *6 (Tenn. Workers' Comp. Panel Nov. 15, 2005).  *See* Tenn. Code Ann. § 50-6-207(2) (2015).  Temporary restrictions assigned by physicians during an injured worker's medical treatment do not establish an entitlement to continued temporary disability benefits if the employee is able to work without loss of income.  *See Long v. Mid-Tennessee Ford Truck Sales*, 160 S.W.3d 504, 511 (Tenn. 2005); *Vinson v. Firestone Tire and Rubber Co.*, 655 S.W.2d 931, 933 (Tenn. 1983).

Even though an employee has a work-related injury for which temporary benefits may be payable, an employer may still enforce workplace rules.  *Carter v. First Source*

---

[2] Employer paid temporary total disability benefits for the period of time Dr. Stone opined Employee was totally unable to work.  All temporary total disability benefits owed have been paid.  Employee's request for temporary total disability benefits is better characterized as a request for temporary partial disability benefits.

*Furniture Grp.*, 92 S.W.3d 367, 368 (Tenn. 2002). Thus, an employee's termination due to a violation of workplace rules may relieve the employer of its obligation to provide temporary partial disability benefits, provided the termination was related to the workplace violation. *See Marvin Windows of Tenn., Inc. v. Gardner*, No. W2011-01479-WC-R3-WC, 2012 Tenn. LEXIS 403, at *9 (Tenn. Workers' Comp. Panel June 8, 2012). When confronted with such a case, courts must "consider the employer's need to enforce workplace rules and the reasonableness of the contested rules." *Id.* at 10. An employer will not be penalized for enforcing a policy if the court determines "(1) that the actions allegedly precipitating the employee's dismissal qualified as misconduct under established or ordinary workplace rules and/or expectations; and (2) that those actions were, as a factual matter, the true motivation for the dismissal." *Durham v. Cracker Barrel Old Country Store, Inc.*, No. E2008-00708-WC-R3-WC, 2009 Tenn. LEXIS 3, at *9 (Tenn. Workers' Comp. Panel Jan. 5, 2009).

In the instant case, the determinative issues are whether Employer came forward with sufficient evidence to support its position that Employee was terminated for violating workplace rules and whether Employee came forward with evidence that the stated reason for the termination was merely a pretext. The trial court determined that Employer terminated Employee for cause, "mak[ing] it unnecessary to determine if [Employer] would have offered [Employee] a light duty position had it not terminated him." For the reasons that follow, we conclude from our independent review of the record that the evidence does not preponderate against the trial court's determinations that Employee was terminated for misconduct and that Employee is not due additional temporary disability benefits.

The trial court found Employer's witnesses to be credible and found the actions of Employee's supervisor and Employer's safety manager in terminating Employee to be reasonable. While it is the responsibility of a reviewing court to conduct an in-depth examination of the trial court's factual findings and conclusions, *Wilhelm v. Krogers*, 235 S.W.3d 122, 126 (Tenn. 2007), our review of the trial court's order is governed by Tennessee Code Annotated sections 50-6-217(a)(3), as referenced above, and 50-6-239(c)(7) (2015). Section 50-6-239(c)(7) provides a presumption "that the findings and conclusions of the workers' compensation judge are correct, unless the preponderance of the evidence is otherwise." Furthermore, when the trial court has seen and heard the witnesses, considerable deference must be afforded the trial court's factual findings. *Tyron v. Saturn Corp.*, 254 S.W.3d 321, 327 (Tenn. 2008). Nonetheless, we must still assess independently where the preponderance of the evidence lies. *See* Tenn. Code Ann. § 50-6-239(c)(7).

The testimony of Employer's witnesses concerning whether Employee operated the backhoe contrary to his supervisor's instructions was consistent. As a result of the manner in which Employee operated the backhoe, the gas line was ruptured, Employer incurred expenses, and work time was lost. Employer's mechanic, who was present at

7

the jobsite, and Employee's supervisor testified that Employee was asked to stop digging so a laborer could uncover the gas line. When Employee continued to dig, the supervisor warned Employee not to hit the gas line. There is no evidence other than Employee's testimony that the injury to his forearm was causing him to have difficulties operating the backhoe or that any such difficulties played any part in causing Employee to rupture the gas line. Moreover, Employee's supervisor testified that Employee did not complain of any physical difficulties operating the backhoe prior to the gas line rupture. The Employee Information Handbook, which Employee testified he read, included the following:

> Employees should be concerned with the care and use of company-owned equipment and facilities. Employees are expected to follow all operating instructions, safety standards and guidelines.

> . . . .

> Unsafe, destructive, careless, negligent, or improper use or operation of equipment may result in disciplinary action up to and including termination of employment.

Employee asserts in his brief on appeal that Employer's president, Mr. Haren, "acknowledged that [Employee's] alleged conduct as described didn't constitute a violation of a direct order." On cross-examination Mr. Haren was asked, "[b]ased on your understanding of the policies, what was the reason why Haren Construction Company fired [Employee]?" Consistent with the testimony of Employee's supervisor, Mr. Haren responded "[b]ecause he disobeyed an order not to dig around that gas line." Employee's counsel then represented to Mr. Haren that when the supervisor told Employee to stop digging Employee said "I think I can get it," and that the supervisor responded, "[w]ell, go ahead." With that representation to Mr. Haren of the supervisor's testimony, counsel then asked, "[i]s that someone disobeying a direct instruction?" Mr. Haren responded, "[i]f it's worded that way, no." However, Employee's supervisor did not testify that he told Employee "[w]ell, go ahead," as was represented to Mr. Haren. Employee does not cite in the record where this alleged testimony of the supervisor appears and our independent review of the record does not disclose such testimony.

Employee additionally asserts "[t]here was nothing in the record to suggest that any past conduct or 'inadequacies' . . . went into the determination to terminate [Employee]." However, Employee's supervisor was asked whether he had ever reprimanded Employee about the operation of equipment and testified he had done so four times before the incident when the gas line was ruptured. The supervisor was asked whether he was confident he had spoken to Employee about his operation of the equipment on previous occasions and responded, "[y]es, ma'am. Because I wrote it in my journal every time I had to." Furthermore, when asked to tell the substance of the

conversation he had with Employee when Employee was terminated, the supervisor testified "I just told him that by the way he'd been running the equipment erratically and then hitting a gas line that was exposed, then we are going to have to terminate him." Employee has not offered evidence of any contrary reason for his termination and has not set forth even a plausible circumstantial case that his termination was motivated by anything other than the manner in which he operated equipment. Thus, we find that Employee's actions precipitating his dismissal qualified as misconduct under Employer's workplace policies and that those actions were the true motivation for Employee's termination.

Finally, Employee contends the trial court "did not address the second prong of the analysis it suggested was necessary for [Employee] to prevail and recover [temporary disability benefits]," which is "whether [Employer] ever intended to provide 'light duty work.'" Employer presented unrefuted testimony from both its president and its safety manager addressing the company's policy regarding the accommodation of light duty restrictions. Accordingly, we find no merit in Employee's insistence that the company would not have provided light duty work within Employee's restrictions had Employee not been terminated for cause.

## Conclusion

For the foregoing reasons, we hold that the evidence does not preponderate against the trial court's decision to deny temporary disability benefits at this interlocutory stage of the case. Nor does the trial court's decision violate any of the standards set forth in Tennessee Code Annotated section 50-6-217(a)(3). Accordingly, the trial court's decision is affirmed as modified. The case is remanded for any further proceedings that may be necessary.

**David F. Hensley, Judge**
**Workers' Compensation Appeals Board**

9





**FILED**

**March 30, 2016**

**TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD**

**Time: 10:25 AM**

# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | | |
|---|---|---|
| Stephen W. Shepherd | ) | Docket No. 2015-01-0325 |
| | ) | |
| v. | ) | |
| | ) | State File No. 78562-2015 |
| Haren Construction Co., Inc., et al. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Appeals Board's decision in the referenced case was sent to the following recipients by the following methods of service on this the 30th day of March, 2016.

| Name | Certified Mail | First Class Mail | Via Fax | Fax Number | Via Email | Email Address |
|---|---|---|---|---|---|---|
| **William J. Brown** | | | | | X | wjb@vollaw.com |
| **Leslie Bishop** | | | | | X | lbishop@lewisthomason.com |
| **Thomas Wyatt** | | | | | X | Via Electronic Mail |
| **Kenneth M. Switzer, Chief Judge** | | | | | X | Via Electronic Mail |
| **Penny Shrum, Clerk, Court of Workers' Compensation Claims** | | | | | X | Penny.Patterson-Shrum@tn.gov |

Jeanette Baird
Deputy Clerk, Workers' Compensation Appeals Board
220 French Landing Dr., Ste. 1-B
Nashville, TN 37243
Telephone: 615-253-0064
Electronic Mail: Jeanette.Baird@tn.gov